Citation Nr: 1761198 
Decision Date: 12/29/17 Archive Date: 01/02/18

DOCKET NO. 08-37 238 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in St. Petersburg, Florida


THE ISSUES

1. Entitlement to service connection for a bilateral neurological disability of the upper extremities (to include carpal tunnel syndrome), to include as secondary to service connected cervical spine and lumbar spine disabilities.

2. Entitlement to service connection for a left elbow disability.

3. Entitlement to an increased rating for bilateral hearing loss, rated noncompensable prior to July 2, 2010, and 10 percent disabling since that date.

4. Entitlement to a total rating for compensation purposes based on individual unemployability (TDIU) due to service-connected disabilities.


REPRESENTATION

Appellant represented by: Disabled American Veterans


WITNESS AT HEARING ON APPEAL

The Veteran


ATTORNEY FOR THE BOARD

B. Elwood, Counsel


INTRODUCTION

The Veteran served on active duty from September 1975 to September 1995.

These matters initially came before the Board of Veterans' Appeals (Board) from a June 2008 rating decision of the Department of Veterans Affairs (VA) Regional Office (RO) in St. Petersburg, Florida. In that decision, the RO denied entitlement to service connection for carpal tunnel syndrome and a left elbow disability and denied entitlement to a compensable rating for bilateral hearing loss.

The Veteran testified before the Board at an August 2009 hearing at the RO (Travel Board hearing), and a transcript of that hearing has been associated with his file.

In April 2010, the Board remanded the service connection and increased rating issues listed above for further development.

In May 2011, the Appeals Management Center (AMC) granted an increased (10 percent) rating for bilateral hearing loss, effective from July 2, 2010.

The Board again remanded the service connection and increased rating issues listed above for further development in December 2011.

In September 2014, the Board expanded the appeal to include the inferred issue of entitlement to a TDIU as a component of the claim for an increased rating for bilateral hearing loss. See Rice v. Shinseki, 22 Vet. App. 447 (2009). The Board remanded the TDIU issue, as well as the service connection and increased rating issues listed above, for further development.

In light of the Veteran's reported symptoms and contentions and to encompass all disorders that are reasonably raised by the record, the Board has re-characterized the claim of service connection for bilateral carpal tunnel syndrome as a claim of service connection for a bilateral neurological disability of the upper extremities (to include carpal tunnel syndrome), as listed above on the title page. See Clemons v. Shinseki, 23 Vet. App. 1 (2009) (holding that, in determining the scope of a claim, the Board must consider the claimant's description of the claim, the symptoms described, and the information submitted or developed in support of the claim).

As a final preliminary matter, the Board points out that in April 2017 the Veteran filed a notice of disagreement (NOD) with an April 2016 rating decision in which the RO, among other things, denied entitlement to increased ratings for hypertension, traumatic arthritis of the lumbar spine, and traumatic arthritis of the cervical spine. In a May 2017 letter, the RO acknowledged that it was in receipt of the Veteran's NOD. Furthermore, the Veterans Appeals Control and Locator System (VACOLS) shows that the RO has acknowledged receipt of the NOD and that additional action is pending. As such, this situation is distinguishable from that in Manlincon v. West, 12 Vet. App. 238 (1999), where an NOD had not been recognized. As the Veteran's NOD has been recognized, the Board declines to remand the issues adjudicated by the RO in the April 2016 rating decision for issuance of a statement of the case (SOC) and instead refers these matters to the agency of original jurisdiction (AOJ) to issue an appropriate SOC after completing any additional notification and/or development deemed warranted.

The issues of entitlement to service connection for a left elbow disability, entitlement to an increased rating for bilateral hearing loss, and entitlement to a TDIU are addressed in the REMAND portion of the decision below and are REMANDED to the AOJ.

FINDING OF FACT

The Veteran's current bilateral neurological disability of the upper extremities did not have its onset in service, was not exhibited within the first post-service year, is not otherwise related to active duty, and is not caused or aggravated by a service-connected disability.


CONCLUSION OF LAW

The criteria for service connection for a bilateral neurological disability of the upper extremities are not met. 38 U.S.C. §§ 1101, 1110, 1112, 1113(b), 1131, 1137, 5107(b) (2012); 38 C.F.R. §§ 3.102, 3.303, 3.307(a), 3.309(a), 3.310 (2017).


REASONS AND BASES FOR FINDING AND CONCLUSION

I. Duties to Notify and Assist

The Veterans Claims Assistance Act of 2000 as amended (VCAA) and implementing regulations impose obligations on VA to provide claimants with notice and assistance. 38 U.S.C. §§ 5102, 5103, 5103A, 5107, 5126 (2012); 38 C.F.R §§ 3.102, 3.156(a), 3.159, 3.326(a) (2017). 

Under the VCAA, VA must inform the claimant of any information and evidence not of record (1) that is necessary to substantiate the claim; (2) that VA will seek to provide; and (3) that the claimant is expected to provide. Pelegrini v. Principi, 18 Vet. App. 112, 120-21 (2004); see 38 U.S.C. § 5103(a); 38 C.F.R. § 3.159(b).

The United States Court of Appeals for Veterans Claims (Court) has also held that the VCAA notice requirements of 38 U.S.C. § 510 (a) and 38 C.F.R. § 3.159(b) apply to all five elements of a service connection claim. Those five elements include 1) Veteran status; 2) existence of a disability; 3) a connection between the Veteran's service and the disability; 4) degree of disability; and 5) effective date of the disability. Dingess/Hartman v. Nicholson, 19 Vet. App. 473 (2006).

In a pre-adjudication letter dated in April 2007, the RO notified the Veteran of the evidence needed to substantiate his claim of service connection for a bilateral neurological disability of the upper extremities on both a direct and secondary basis. This letter also satisfied the second and third elements of the duty to notify by delineating the evidence VA would assist him in obtaining and the evidence it was expected that he would provide. Quartuccio v. Principi, 16 Vet. App. 183, 186-87 (2002); Charles v. Principi, 16 Vet. App. 370 (2002).

The claimant's Veteran status has been substantiated. He was notified of all other elements of the Dingess notice, including the disability rating and effective date elements of his claim, in the April 2007 letter. 

The VCAA also requires VA to make reasonable efforts to help a claimant obtain evidence necessary to substantiate his claim. 38 U.S.C. § 5103A; 38 C.F.R. § 3.159(c), (d). This "duty to assist" contemplates that VA will help a claimant obtain records relevant to his claim, whether or not the records are in Federal custody, and that VA will provide a medical examination or obtain an opinion when necessary to make a decision on the claim. 38 C.F.R. § 3.159(c)(4).

VA obtained the Veteran's service treatment records and all of the identified relevant post-service VA treatment records and private medical records. In addition, the Veteran was afforded VA examinations and opinions were obtained pertaining to the etiology of his claimed bilateral neurological disability of the upper extremities.

In its April 2010, December 2011, and September 2014 remands, the Board instructed the AOJ to, among other things, ask the Veteran to identify any outstanding treatment records and to complete the appropriate authorization so as to allow VA to obtain any outstanding private treatment records (to include records from Premier Spine and Pain Center, Heartland Rehabilitation Service, Dr. Loper, and Shands/University of Florida), attempt to obtain any identified and authorized private treatment records, attempt to obtain any Social Security Administration (SSA) disability records, and afford the Veteran VA examinations to obtain opinions as to the nature and etiology of his claimed bilateral neurological disability of the upper extremities.

The Veteran was afforded VA examinations in July 2010, March 2015, and May 2017 and opinions were obtained that address the etiology of his claimed bilateral neurological disability of the upper extremities. Moreover, the Veteran was asked to identify any outstanding relevant private treatment records (to include any such records from Premier Spine and Pain Center, Heartland Rehabilitation Service, Dr. Loper, and Shands/University of Florida) by way of letters dated in May 2010, December 2011, and October 2015. All identified treatment records pertinent to the claim of service connection for a bilateral neurological disability of the upper extremities for which a sufficient authorization was received (including records from Premier Spine and Pain Center and Heartland Rehabilitation Service) have been obtained and associated with the claims file. In this regard, VA is only required to seek pertinent records that are adequately identified and for which necessary releases are furnished. 38 U.S.C. § 5103A(b); see Wood v. Derwinski, 1 Vet. App. 190, 193 (1991) (the duty to assist is not always a one-way street); 38 C.F.R. §§ 3.159(c)(1)(i), (c)(2)(i) (requiring a claimant to cooperate fully with VA's efforts to obtain federal and non-federal records).

Moreover, in November 2014, the AOJ contacted the SSA and requested all available records pertaining to any SSA claim(s) submitted by the Veteran. The SSA responded that no records could be sent and that further efforts to obtain any such records would be futile because there were no such records. The Veteran has subsequently clarified that he has never filed any claim for SSA disability benefits and that any references to such benefits in his records are erroneous (see a January 2015 VA addendum note). Therefore, any further efforts to obtain SSA records would be futile. 38 C.F.R. § 3.159(c)(1).

Hence, with respect to the claim of service connection for a bilateral neurological disability of the upper extremities, the AOJ substantially complied with all of the Board's April 2010, December 2011, and September 2014 remand instructions. VA has no further duty to attempt to obtain any additional records, conduct additional examinations, or obtain additional opinions with respect to the matter decided herein. See Dyment v. West, 13 Vet. App. 141, 146-47 (1999); Stegall v. West, 11 Vet. App. 268 (1998).

II. Analysis

Service connection will be granted for a disability resulting from disease or injury incurred in or aggravated by active service. 38 U.S.C. §§ 1110, 1131; 38 C.F.R. § 3.303.

Establishing service connection generally requires competent evidence of three things: (1) a current disability; (2) in-service incurrence or aggravation of a disease or injury; and (3) a causal relationship, i.e., a nexus, between the current disability and an in-service precipitating disease, injury or event. Fagan v. Shinseki, 573 F.3d 1282, 1287 (Fed. Cir. 2009); 38 C.F.R. § 3.303(a). 

Service connection is also provided for a disability which is proximately due to, the result of, or aggravated by a service-connected disability. Allen v. Brown, 7 Vet. App. 439 (1995); 38 C.F.R. § 3.310.

Under 38 C.F.R. § 3.303(b), an alternative method of establishing service connection for certain chronic disabilities listed in 38 C.F.R. § 3.309(a), including organic diseases of the nervous system, is through a demonstration of continuity of symptomatology. See Clyburn v. West, 12 Vet. App. 296, 302 (1999). Continuity of symptomatology may be established if a claimant can demonstrate (1) that a condition was "noted" during service; (2) evidence of post-service continuity of the same symptomatology; and (3) medical or, in certain circumstances, lay evidence of a nexus between the present disability and the post-service symptomatology. See Walker v. Shinseki, 708 F.3d 1331, 1338 (Fed. Cir. 2013); 38 C.F.R. §§ 3.303(b), 3.309(a).

In relevant part, 38 U.S.C. § 1154(a) (2012) requires that VA give "due consideration" to "all pertinent medical and lay evidence" in evaluating a claim for disability or death benefits. Davidson v. Shinseki, 581 F.3d 1313 (Fed. Cir. 2009).

The United States Court of Appeals for the Federal Circuit (Federal Circuit) has held that "[l]ay evidence can be competent and sufficient to establish a diagnosis of a condition when (1) a layperson is competent to identify the medical condition, (2) the layperson is reporting a contemporaneous medical diagnosis, or (3) lay testimony describing symptoms at the time supports a later diagnosis by a medical professional." Jandreau v. Nicholson, 492 F.3d 1372, 1377 (Fed. Cir. 2007); see also Buchanan v. Nicholson, 451 F.3d 1331, 1337 (Fed. Cir. 2006) ("[T]he Board cannot determine that lay evidence lacks credibility merely because it is unaccompanied by contemporaneous medical evidence").

Once evidence is determined to be competent, the Board must determine whether such evidence is also credible. See Layno v. Brown, 6 Vet. App. 465, 469 (1994) (distinguishing between competency ("a legal concept determining whether testimony may be heard and considered") and credibility ("a factual determination going to the probative value of the evidence to be made after the evidence has been admitted")).

Service connection may also be granted for a disease first diagnosed after discharge when all of the evidence, including that pertinent to service, establishes that the disease was incurred in service. 38 C.F.R. § 3.303(d). 

Additionally, certain chronic disabilities, such as organic diseases of the nervous system, are presumed to have been incurred in service if such is manifested to a compensable degree within one year of separation from qualifying service. 38 U.S.C. §§ 1101, 1112, 1137; 38 C.F.R. §§ 3.307(a), 3.309(a).

Notwithstanding the foregoing presumption, a claimant is not precluded from establishing service connection with proof of direct causation. 38 U.S.C. § 1113(b); Combee v. Brown, 34 F.3d 1039, 1042 (Fed. Cir. 1994).

When there is an approximate balance of positive and negative evidence regarding any issue material to the determination of a matter, the Secretary shall give the benefit of the doubt to the claimant. 38 U.S.C. § 5107; see also Gilbert v. Derwinski, 1 Vet. App. 49, 53 (1990).

In this case, the Veteran's medical records reveal that he has been diagnosed as having various neurological disabilities of the upper extremities. For example, VA examination reports dated in November 2007, July 2010, March 2015, and May 2017 document diagnoses of left ulnar neuropathy secondary to entrapment/compression of the ulnar nerve at the elbow and bilateral carpal tunnel syndrome. Thus, a current neurological disability of the upper extremities has been demonstrated.

The Veteran contends that his current neurological disability of the upper extremities is related to his various physical duties in service and an injury in service when he fell off a vehicle while collecting garbage barrels. In the alternative, he claims that the disability is related to his service-connected cervical spine and lumbar spine disabilities. He has also reportedly experienced a continuity of upper extremity neurological symptomatology in the years since service.

The Veteran is competent to report the history of his claimed upper extremity neurological disability, including a continuity of symptomatology in the years since service. However, his reports must be weighed against the objective evidence and their credibility must be assessed. See Jandreau, 492 F.3d at 1376-77; Buchanan, 451 F.3d at 1336.

Service treatment records reflect that in December 1992 the Veteran was treated for right arm tenderness (to include the elbow and wrist) and was diagnosed as having overuse tendonitis of the right upper extremity and a right elbow strain. In May 1995 he experienced numbness and a tingling sensation at the left shoulder and cervical pain with radiating symptoms (numbness and weakness) to the left upper extremity. Examinations revealed impaired upper extremity reflexes and diminished sensation in the left upper extremity. The Veteran was diagnosed as having degenerative joint disease of the cervical spine with nerve root irritation/C5-7 nerve root impingement and possible radiculopathy. There is no evidence of any other reports of or treatment for neurological problems in the Veteran's service treatment records and his June 1995 retirement examination was normal other than for hearing loss, excessive weight, and scars.

The evidence otherwise indicates that the Veteran's current neurological disability of the upper extremities did not manifest until after service. The first post-service clinical evidence of neurological symptoms is an August 2000 VA abbreviated history and physical note which reveals that the Veteran reported that he had experienced numbness in the fingertips of his left hand since 1992. The Board acknowledges that there is lay evidence of earlier neurological symptoms following service in that the Veteran has reported a continuity of upper extremity neurological symptomatology in the years since service. As explained below, however, the Board finds that the Veteran's reports of a continuity of upper extremity neurological symptomatology in the years since service are not credible.

The Veteran has provided inconsistent information concerning the history of his claimed neurological disability of the upper extremities, to include information and statements which are inconsistent with his reports of a continuity of upper extremity neurological symptomatology. He has claimed that his upper extremity neurological symptoms began in service and that they have continued in the years since that time. However, he reported on a June 1995 report of medical history form completed for purposes of his retirement examination that he was neither experiencing, nor had he ever experienced, any neuritis or paralysis. Also, although he reported during the May 2017 VA neurological examination that "the onset of bilateral carpal tunnel was in 1992 or 1993," the August 2000 VA abbreviated history and physical note reflects that he only reported left hand numbness and he reported during a November 2007 VA neurological examination that there was numbness and tingling in his left hand and forearm, but that "[h]is right upper extremity, including his right hand, [did] not bother him to a significant degree." Such information provided by the Veteran is inconsistent with his contention that he has experienced a continuity of bilateral upper extremity neurological symptomatology in the years since service. The Board finds the contemporaneous statements and those made to health care providers to be of greater probative weight than the later statements made during the course of an appeal from the denial of compensation benefits. Fed. R. Evid. 803(4) (recognizing that statements made for the purpose of medical treatment generally are reliable); Rucker v. Brown, 10 Vet. App. 67, 73 (1997) ("[R]ecourse to the [Federal] Rules [of Evidence] is appropriate where they will assist in the articulation of the Board's reasons"); Pond v. West, 12 Vet. App. 341, 345 (1999) (interest may affect the credibility of testimony).

In light of the fact that the Veteran's June 1995 retirement examination was normal other than for hearing loss, excessive weight, and scars, the absence of any clinical evidence of neurological symptoms for several years following service, and the inconsistent information and statements provided by the Veteran concerning the history of his upper extremity neurological disability (including information and statements that are inconsistent with his reports of a continuity of bilateral upper extremity neurological symptomatology in the years since service), the Board concludes that his reports concerning the history of his current bilateral neurological disability of the upper extremities (including any reports of a continuity of symptomatology in the years since service), are not credible. Thus, neither the clinical record nor the lay statements of record establish a continuity of symptomatology in this case.

The physician who conducted the November 2007 VA neurological examination concluded that he was unable to opine as to whether the Veteran's diagnosed upper extremity neurological disabilities were related to his service-connected cervical and lumbar spine disabilities without resorting to mere speculation. He explained that based on nerve conduction studies, the disabilities did not appear to be related to the Veteran's cervical spine. Rather, they appeared to be more of a peripheral neuropathy coming from entrapment at the elbow and the wrist and they did not appear to be related to his cervical neck injury.

The physician who conducted the July 2010 VA neurological examination concluded that he was unable to opine as to whether the Veteran's diagnosed upper extremity neurologic disabilities were related to service without resort to mere speculation. He reasoned that although service treatment records included a May 1995 record of treatment for left hand numbness, there was no diagnosis made and there was no evidence of any other potential carpal tunnel or ulnar nerve entrapment symptoms, treatments, or diagnoses in the Veteran's service treatment records (including during the June 1995 separation examination which did not indicate any neurologic abnormalities). Thus, there was no objective evidence that the left hand numbness documented during service was more than an acute and transitory event, or that it could have been caused or related to carpal tunnel syndrome or left ulnar nerve entrapment.

The March 2015 VA neurological examination report includes opinions that the Veteran's left carpal tunnel syndrome and left ulnar nerve compression neuropathy at the elbow did not likely ("less likely as not"/"less than 50 percent probability") have their onset in service and were not likely ("less likely as not"/"less than 50 percent probability") related to the Veteran's upper extremity neurological symptoms in service, related to his reported injury in service when he fell off a vehicle while collecting garbage barrels, related to his various duties in service, otherwise the result of a disease or injury in service, or caused or aggravated by his service-connected traumatic arthritis of the cervical spine or traumatic arthritis of the lumbar spine. The physician who conducted the examination reasoned that a review of the Veteran's service treatment records revealed that he reported paresthesia (numbness/tingling into his left upper extremity from the shoulders down) in May 1995 during an evaluation for his service-connected neck disability. Numbness and tingling are generic end point symptoms that occur whenever there is some irritation of nerves, joint capsule nerve endings, etc., but the causes can be completely different, involve different structures, and occur in different diseases. For instance, referred symptoms from the neck are from spine structures and not the peripheral nerves. Compression neuropathies, such as carpal tunnel and ulnar elbow neuropathies, are from focal/local direct compression on the nerves peripherally, and diabetic neuropathy numbness/tingling comes from metabolic (hyperglycemic) involvement of distal nerve endings. There is no history or indication of carpal tunnel syndrome or ulnar neuropathy during the Veteran's active duty service.

The examiner further explained that carpal tunnel syndrome is a common condition in the general population and that a specific or definite cause is unknown, even though it is often seen in people with metabolic conditions such as diabetes or hypothyroidism. Ulnar neuropathy at the elbow can occur when people habitually sleep on flexed elbows, when there is tightening of fibrous tissue over the nerve at the elbow, etc. Symptoms may improve, but can and often persist even after surgical procedures. There is no scientific evidence that cervical or lumbar spine conditions cause or aggravate peripheral nerve compressions, they are anatomically distant from the peripheral nerve, and they have different pathomechanisms. A review of the Veteran's service treatment records revealed that he reported on the June 1995 report of medical history form that he experienced elbow pain because he fell off a trailer hyperextension under load in 1977, but that his elbow was "ok" at the time he completed the report of medical history form. There was no indication of his claimed nerve compression neuropathies. There was no report of nerve compressions due to his active duty activities and there was no history of the claimed nerve compressions during his active duty period. Upon review of the Veteran's history and treatment records (including service treatment records, private treatment records, and 2006 and 2010 electromyograph (EMG) studies) and examination of the Veteran, it seemed "highly unlikely" that the left upper extremity compression neuropathies diagnosed 11 years after separation from service would be related to or due to incidents/activities during active duty.

The physician who conducted the May 2017 VA neurological examination opined that it was not likely ("less likely as not"/"50 percent or less probability") that the Veteran's current neurological disability of the upper extremities had its onset in service, was related to his upper extremity neurological symptoms in service, was related to his reported injury in service when he fell off a vehicle while collecting garbage barrels, was related to his various duties in service, or was otherwise the result of a disease or injury in service. The examiner reasoned that the Veteran did not report any neuritis on the report of medical history form completed for purposes of his retirement examination and that although he identified a list of numerous ailments at that time, he did not report any nerve condition or median neuropathy. Also, the remainder of his service treatment records were silent for any median neuropathy or carpal tunnel syndrome. The Veteran submitted private treatment records dated since 1995 and these records are silent for any nerve condition until 2006. He had annual examinations, in addition to other periodic examinations, since 1995 and the records were well organized and documented all the ailments the Veteran presented with during that time frame. The records were silent for any nerve or carpal tunnel condition during the period from 1995 through 2006. The Veteran reported during the May 2017 examination that he did not feel things when he was young, but that as he got older, he developed medical conditions and claimed them related to service. He was first diagnosed as having carpal tunnel syndrome and cubital tunnel syndrome in 2006.

The examiner also opined that it was not likely ("less likely than not"/"50 percent or less probability") that the Veteran's current neurological disability of the upper extremities was caused (in whole or in part) by his service-connected traumatic arthritis of the cervical spine or traumatic arthritis of the lumbar spine. The examiner explained that the Veteran reported that he was not claiming that his lumbar spine was involved because it did not make any medical sense. He did, however, contend that his carpal tunnel syndrome was related to his cervical spine arthritis. However, this was not supported by the objective evidence, including EMG/NCS studies in 2006 and 2015, which revealed that the Veteran had distal nerve compressions. He had some other findings that were possibly suggestive of radiculopathy, but he had diabetic polyneuropathy which accounted for those symptoms. There was no evidence of any neural foramen narrowing, but there was a long history of type II diabetes mellitus.

Lastly, the May 2017 examiner opined that it was not likely ("less likely than not"/"50 percent or less probability") that the Veteran's current neurological disability of the upper extremities was aggravated (made chronically worse) by his service-connected traumatic arthritis of the cervical spine or traumatic arthritis of the lumbar spine. The examiner explained that the current neurological disability was likely worsened or aggravated by the Veteran's non service-connected type II diabetes mellitus, not arthritis. Arthritis of the spine does not affect compression neuropathies so as to worsen the compression and it is pathophysiologically implausible.

The November 2007 and July 2010 opinions are adequate to the extent that they are accompanied by specific rationales addressing why a definitive conclusion as to the etiology of the Veteran's upper extremity neurological disability could not be made. See Jones v. Shinseki, 23 Vet. App. 382 (2010). Nevertheless, the examiners stated that an opinion could not be provided without resort to speculation and this statement weighs neither for nor against the claim. Fagan v. Shinseki, 573 F.3d 1282 (Fed. Cir. 2009).

The March 2015 and May 2017 opinions do not explicitly acknowledge or discuss the Veteran's reports of a continuity of symptomatology in the years since service. However, as explained above, any reports of a continuity of symptomatology are not deemed to be credible and an opinion based on such an inaccurate history would be inadequate. See Boggs v. West, 11 Vet. App. 334, 345 (1998); Kightly v. Brown, 6 Vet. App. 200, 205-06 (1994); Reonal v. Brown, 5 Vet. App. 458, 460-61 (1993). The March 2015 and May 2017 opinions are based upon examinations of the Veteran and a complete review of his medical records and reported history, and are accompanied by specific rationales that are consistent with the evidence of record. Thus, these opinions are adequate and entitled to substantial probative weight. See Nieves-Rodriguez v. Peake, 22 Vet. App. 295, 304 (2008) (most of the probative value of a medical opinion comes from its reasoning; threshold considerations are whether the person opining is suitably qualified and sufficiently informed).

The Veteran has expressed his belief that his current bilateral neurological disability of the upper extremities is related to his fall injury and duties in service or his service-connected spinal disabilities. Lay evidence may be competent on a variety of matters concerning the nature and cause of disability. Jandreau, 492 F.3d at 1377 n.4. Once the threshold of competency is met, however, the Board must consider how much of a tendency a piece of evidence has to support a finding of the fact in contention. Not all competent evidence is of equal value.

The question presented in this case (i.e., whether any relationship exists between the Veteran's current bilateral neurological disability of the upper extremities and his military service or a service-connected spinal disability) is a question as to an internal medical process which extends beyond an immediately observable cause-and-effect relationship that is of the type that the courts have found to be beyond the competence of lay witnesses. Compare Jandreau, 492 F.3d at 1376 (lay witness capable of diagnosing dislocated shoulder); Barr v. Nicholson, 21 Vet. App. 303, 308-9 (2007); Falzone v. Brown, 8 Vet. App. 398, 403 (1995) (lay person competent to testify to pain and visible flatness of his feet); with Clemons v. Shinseki, 23 Vet. App. 1, 6 (2009) ("It is generally the province of medical professionals to diagnose or label a mental condition, not the claimant"); Woehlaert v. Nicholson, 21 Vet. App. 456, 462 (2007) (unlike varicose veins or a dislocated shoulder, rheumatic fever is not a condition capable of lay diagnosis); Jandreau, 492 F.3d at 1377, n.4 ("sometimes the layperson will be competent to identify the condition where the condition is simple, for example a broken leg, and sometimes not, for example, a form of cancer"). See also Colantonio v. Shinseki, 606 F.3d 1378, 1382 (Fed. Cir.2010) (recognizing that in some cases lay testimony "falls short" in proving an issue that requires expert medical knowledge). 

To the extent that the Veteran is attempting to establish nexus through his own opinion, as a lay person he has not been shown to be capable of making such conclusions on such a complex medical matter. An opinion as to the link between any current upper extremity neurological disability and service (where there is no credible evidence of upper extremity neurological symptoms for several years after service) or a service-connected spinal disability, is one requiring specialized knowledge and testing to understand the complex nature of the nervous system. The Veteran has not indicated that he has such experience. Hence, his opinion on this question is not competent evidence. To the extent that the Veteran's statements in this regard are competent, the Board finds the specific, reasoned opinions of the trained physicians who provided the March 2015 and May 2017 opinions to be of greater probative weight than the Veteran's more general lay assertions. 

There is no other evidence of a relationship between the Veteran's current bilateral neurological disability of the upper extremities and service or a service-connected disability, and neither he nor his representative has alluded to the existence of any such evidence. Thus, the preponderance of the evidence is against a finding that the Veteran's current bilateral neurological disability of the upper extremities manifested in service, manifested within a year after his September 1995 separation from service, is otherwise related to service, or is caused or aggravated by a service-connected disability. As the preponderance of the evidence is against the Veteran's claim, the benefit-of-the-doubt doctrine is not for application, and the claim of service connection for a bilateral neurological disability of the upper extremities must be denied. See 38 U.S.C. § 5107(b); 38 C.F.R. § 3.102.


ORDER

Entitlement to service connection for a bilateral neurological disability of the upper extremities is denied.


REMAND

The Veteran contends that he has a current left elbow disability which is related to his various physical duties in service and an in-service left elbow injury. He has reportedly experienced a continuity of left elbow symptomatology in the years since service, but there is some evidence to the contrary. For example, there were no left elbow problems found during his June 1995 retirement examination and the first post-service clinical evidence of upper extremity problems is not for several years following his separation from service. Also, he reported on a June 1995 report of medical history form completed for purposes of separation from service that although he had experienced left elbow pain following an injury in 1977, the elbow was "ok" at the time of the separation examination.

A VA orthopedic examination was conducted in July 2010 to assess the nature and etiology of any current left elbow disability and the Veteran was diagnosed as having a left elbow strain. The physician who conducted the examination explained that the Veteran's service treatment records were silent for any chronic findings of left elbow diagnoses and that there was no objective evidence of a left elbow joint condition caused by service.

In its September 2014 remand, the Board explained that the July 2010 opinion was insufficient because, among other things, it was entirely based on a lack of objective clinical evidence of treatment for left elbow problems in the Veteran's service treatment records and did not reflect consideration of his report of a left elbow injury in service (as documented on the June 1995 report of medical history form). Thus, the Board directed the AOJ to afford the Veteran a new VA orthopedic examination to obtain an opinion as to the nature and etiology of any current left elbow disability. The examiner was instructed to acknowledge and comment on all left elbow disabilities diagnosed since February 2007 (including, but not limited to, a left elbow strain).

Pursuant to the Board's remand, the Veteran was afforded a VA elbow examination in March 2015 and was only diagnosed as having "left elbow pain per [V]eteran." The examiner who conducted the examination opined that it was not likely ("less likely as not"/"less than 50/50 probability") that the Veteran's "claimed left elbow pain" had its onset in service, was related to the Veteran's reported injury in service when he fell off a vehicle while collecting garbage barrels, was related to his reported duties in service, or was otherwise the result of a disease or injury in service. The examiner reasoned that a review of the Veteran's service treatment records revealed elbow complaints that all point to the right side being involved, not the left side. The only mention of the left elbow was likely an error on the part of the examiner who conducted the Veteran's June 1995 separation examination. The Veteran himself wrote right elbow pain at the top of the report and all service treatment records prior to that report were for the right elbow. Treatment records dated after separation from service which mention treatment for the elbow also only indicate the right side, not the left. It was unlikely that there would be a left elbow condition from or related to any activity or incident in service when it was not treated during active duty or reported at the time of separation and there is no credible evidence of left elbow pathology in the years following service or on clinical examination.

A second VA elbow examination was conducted in May 2017 and the physician who conducted the examination indicated that the Veteran did not have any current left elbow diagnosis. The examiner further explained that the left elbow disability claimed by the Veteran was actually scar residuals from a non service-connected cubital tunnel release surgery in 2012. The Veteran's separation examination was silent for any left elbow condition, the Veteran documented a right elbow condition, and the examiner who conducted his separation examination accidently wrote the left elbow. Also, there was no other known left elbow condition other than the scarring from the cubital tunnel release surgery.

The March 2015 and May 2017 opinions are also insufficient because they are also predominantly based on a lack of objective clinical evidence of treatment for left elbow problems in the Veteran's service treatment records. The opinions discount, without explanation, the Veteran's reports that although he was not treated for left elbow problems during service, he injured his left elbow at the same time that he injured his right elbow when he fell from a truck. In this regard, a medical opinion is inadequate if it is based solely on the absence of documentation in the record and does not take into account the Veteran's reports of symptoms and history (even if recorded in the course of the examination). Dalton v. Peake, 21 Vet. App. 23 (2007). 

Moreover, the opinions are partially based on a finding that the Veteran did not have any current left elbow disability other than scarring from cubital tunnel release surgery. The examiners who provided the opinions did not, however, acknowledge or comment on the left elbow diagnoses that have been provided during the claim period, including a left elbow strain (see the July 2010 VA examination report). The Board points out that the requirement for a current disability is satisfied if there is evidence of the disability at any time during the claim period (since approximately February 2007 in this case), even if the disability is currently in remission or has completely resolved. See McClain v. Nicholson, 21 Vet. App. 319 (2008).

Thus, a remand is again necessary to obtain a new opinion as to the etiology of the Veteran's current left elbow disability.

As for the claim for an increased rating for bilateral hearing loss, the evidence reflects that this disability may have worsened since the Veteran's last VA examination in March 2015. For example, a January 2016 VA audiology note (which is located among the Veteran's paperless records in the Virtual VA (Legacy Content Manager) system) indicates that the Veteran reported that "his hearing had decreased since his last hearing evaluation." Given this evidence, VA's duty to obtain a new examination as to the current severity of the Veteran's service-connected hearing loss is triggered.

Also, the claim for a TDIU is inextricably intertwined with the claims of service connection for a left elbow disability and for an increased rating for bilateral hearing loss. Thus, the Board will defer adjudication of the TDIU claim at this time.

Moreover, outstanding VA treatment records should be secured upon remand. In this regard, the January 2016 VA audiology note reflects that audiometry testing and speech discrimination testing was conducted during the examination and that the audiogram results were available "in CPRS under tools menu and audiogram display." The specific pure tone results of the audiometry test, however, are not included in the claims file. Hence, it appears that there are additional pertinent VA treatment records that have not yet been obtained. VA has a duty to obtain any additional relevant records. 38 U.S.C. § 5103A(b),(c); Bell v. Derwinski, 2 Vet. App. 611, 612-13 (1992).

Accordingly, the case is REMANDED for the following action:

1. Obtain and associate with the file all updated VA records of the Veteran's treatment, to specifically include:

(a) the specific results of the audiometry testing conducted on January 22, 2016 (i.e., any specific test results from that date which are available under "audiogram in CPRS under tools menu and audiogram display," as noted by the January 2016 VA audiology note), such as specific pure tone values at various frequencies, NOT merely the January 2016 VA audiology consultation note itself);

(b) all records contained in the Gainesville Vista electronic records system dated since June 2017; and

(c) all such relevant records from any other sufficiently identified VA facility. 

All efforts to obtain these records must be documented in the file. Such efforts shall continue until the records are obtained or it is reasonably certain that they do not exist or that further efforts to obtain them would be futile. If unable to obtain any identified records, take action in accordance with 38 C.F.R. § 3.159(e).

2. After all efforts have been exhausted to obtain and associate with the file any additional treatment records, schedule the Veteran for a VA examination to evaluate the current severity of his service-connected bilateral hearing loss.

All relevant electronic records contained in the VBMS and Virtual VA (Legacy Content Manager) systems, including a copy of this remand and any records obtained pursuant to this remand, must be sent to the examiner for review.

All indicated tests and studies, including a puretone audiometry test and a speech recognition test (Maryland CNC test), shall be conducted, and the results of such testing shall be included in the examination report. The examiner must also fully describe the functional effects of the Veteran's hearing disability.

The examiner must provide a rationale for any opinion given.
The examiner is advised that the Veteran is competent to report his symptoms and history, and such statements by the Veteran must be specifically acknowledged and considered in formulating any opinions concerning the severity of his hearing loss.

3. After all efforts have been exhausted to obtain and associate with the file any additional treatment records, request an opinion from an appropriate medical professional. Ask the medical professional to review all relevant electronic records contained in the VBMS and Virtual VA (Legacy Content Manager) systems (including a copy of this remand along with any records obtained pursuant to this remand) and provide an opinion as to the etiology of the Veteran's current left elbow disability. Only arrange for the Veteran to undergo further examination by an appropriate medical professional if one is deemed necessary in the judgment of the individual designated to provide the opinion.

The opinion provider should identify any left elbow disabilities that have been diagnosed since approximately February 2007 (including, but not limited to, a left elbow strain), even if the disability is currently in remission or has completely resolved, and for each such disability answer the following question:

Is it at least as likely as not (50 percent or greater probability) that the current left elbow disability had its onset in service, had its onset in the year immediately following service (in the case of any currently diagnosed arthritis), is related to the Veteran's reported left elbow injury in service when he fell off a vehicle while collecting garbage barrels, is related to his reported duties in service, or is otherwise the result of a disease or injury in service?

For purposes of this opinion, the opinion provider should presume that the Veteran's reports of a left elbow injury in service due to a fall from a vehicle while collecting garbage barrels are accurate.

In formulating the above opinion, the opinion provider should acknowledge and comment on all left elbow disabilities diagnosed since approximately February 2007 (including, but not limited to, a left elbow strain), the Veteran's reported left elbow injury in service due to a fall from a vehicle (as reported on the June 1995 report of medical history form), his reported duties in service, and his reports of a continuity of symptomatology in the years since service.

The opinion provider must provide a rationale for each opinion given.

The opinion provider is advised that the Veteran is competent to report a left elbow injury in service, his symptoms, and history, and such statements by the Veteran must be specifically acknowledged and considered in formulating any opinions. The absence of evidence of treatment for left elbow problems in the Veteran's service treatment records cannot, standing alone, serve as the basis for a negative opinion. However, the opinion provider must also consider the inconsistent information concerning a continuity of left elbow symptomatology in the years since service.

4. After conducting any additional indicated development, readjudicate the issues on appeal. If a full benefit on appeal remains denied, the AOJ should issue an appropriate supplemental statement of the case. After the Veteran is given an opportunity to respond, the case should be returned to the Board.

The Veteran has the right to submit additional evidence and argument on the matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

This claim must be afforded expeditious treatment. The law requires that all claims remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C. §§ 5109B, 7112 (2012).




______________________________________________
JAMES L. MARCH
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs